THE REGAL SHOP COMPANY *v.*
THE LEGUM DISTRIBUTING COMPANY

[No. 34, October Term, 1954.]

*Decided February 15, 1955.*

*Motion for rehearing or clarification of opinion, filed March 17, 1955, denied March 22, 1955.*

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Preston A. Pairo,* with whom was *Preston A. Pairo, Jr.,* on the brief, for appellant.

*William W. Cahill, Jr.,* and *Robert L. Weinberg,* with whom were *Weinberg & Green,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by The Regal Shop Company, (Regal), a body corporate, appellant, from a judgment against it and in favor of The Legum Distributing Company, (Legum), a body corporate, appellee.

Regal operates a retail store on West Baltimore Street in Baltimore City, selling clothing, furniture, and electrical appliances, including television sets. Legum is a wholesale distributor of electrical appliances, including television sets. Its offices are at 108 Light Street in Baltimore City where it maintains a show room and repair shop on the first floor, and general offices on the second floor. It has a warehouse at 1852 Jackson Street.

In 1950 Regal purchased, on open account, console model television sets from Legum. At the end of the year a number of these sets were unsold. During the latter part of December, 1950, Irvin Lane, sales manager for

Legum, came into the Regal store for the purpose of selling additional television sets. At that time, Harry A. Meyers, the buyer for Regal, obtained permission from Lane for the return of six uncrated console television sets for credit. Meyers testified that on January 2, 1951, he instructed McKinley Brown, the chauffeur for Regal, to take the six television sets to Legum's place of business on Light Street where he had sent electrical appliances to be repaired on previous occasions. There is no evidence, however, that Regal had ever returned any goods to Legum for credit before. Brown transported the six sets on Regal's truck to Legum's place of business on Light Street. He had been given by Meyers a delivery slip in duplicate, a white copy for Legum and a yellow copy to be signed by Legum as a receipt. Meyers told Brown that if he had any difficulty in delivering them to get in touch with him. At the Light Street address the service manager, Mr. Weinkamp, would not accept the sets. Someone from Legum called Meyers and told him "your truck was down here with six television sets. They are out of cartons, and we can't take them back." Meyers then asked the telephone operator at Legum's to locate Lane with whom he had made arrangements for the return. Lane was located in Essex and was told by Meyers that Legum would not accept the return because the sets were not in cartons. Lane told Meyers to "sit tight, I will call you back in a short while." Approximately 20 minutes later Lane called Meyers and said: "Everything is O. K., your boys were instructed to take them to the Jackson Street warehouse." Meyers heard nothing more about the matter until six months later when Regal's bookkeeper showed him a bill for $1,515.15 from Legum. Meyers called Legum and was told that the six television sets, which were supposed to have been returned, were never delivered. Meyers further testified that full signatures on receipts were not required. On some deliveries, not with Legum, a receipt was brought back signed "X". Regal offered to pay the expenses of trying to trace the sets through the manufacturer, but as far as Meyers

knows, this offer had not been accepted. Mr. Weinkamp, the service manager for Legum, testified that they had no storage space at Light Street, and that merchandise was not accepted at Light Street except for repair. Legum admits that the sets did arrive at its Light Street address and that Brown was told by someone there to take them to the Jackson Street warehouse in South Baltimore.

McKinley Brown, not employed by Regal at the time of trial, but who worked for Regal during 1950 and 1951 and up until about four months before the trial, testified that he was driving a truck for Regal in January, 1951. His duties were to make deliveries and pick up merchandise. When he first started to work for Regal he delivered merchandise to Legum two or three times a week. The custom was to leave the white ticket, to have the yellow ticket initialed or signed and returned to Regal. Sometimes, but not from Legum, receipts would be signed with an "X" by persons who could not write their name. He recalled the occasion of the delivery of the six television sets. He carried them to Legum's Light Street office and was told that they would not receive them. He was later told by someone at Legum's to take them to the Jackson Street warehouse, where he had been in the habit of picking up merchandise. This warehouse was an old fashioned car barn. He knew where it was because he had been there on previous occasions to get merchandise. He said he could not read very well. He drove to that warehouse, backed his truck over two-thirds inside the warehouse at the platform and two white men, whom he had never seen before, were at the tail gate of his truck. They had opened the door for him. When he had gone previously to get refrigerators at that location, he had been assisted by white men, who raised them on the truck with a hoist. On this occasion he carried the television sets to the tail gate of the truck and the two white men took them off of the tail gate. One of the men signed the yellow copy of the receipt with a "W" and returned it to Brown. He could not describe these men other than that they were white. He also testified that

they sometimes delivered goods at other places to persons who were unknown to him and he accepted as a signature on the yellow receipt an "X" as proof of delivery.

The service manager, office manager, and shipping clerk for Legum all testified that it was the invariable practice of Legum to issue a receiving report upon receipt of any goods. These reports were kept in a receipt book and this book contained no copy of a ticket given to Regal for the missing television sets. Testimony was also offered that no delivery is accepted at Legum's warehouse unless the goods are inspected and signed for by the shipping clerk or his assistant. One or the other of them were at the warehouse "at all times" and neither of them signs with a "W". Both of them invariably issue a regular receiving report for goods received. This usual procedure does not seem significant in the instant case because here we have the return of television sets not in cartons. The office manager for Legum testified that the six sets could be identified by serial numbers and that every set is sold and invoiced by a serial number. In a search for these sets, Legum checked every invoice for sale or service since the television sets were alleged to have been delivered and none of the six sets have ever been located. The men employed at the Legum warehouse at the time of the delivery denied that the sets were ever received there.

The trial was held before the trial judge without a jury on March 18, 1954. In finding a judgment in favor of Legum for the $1,515.15 claimed, he stated that the burden of proof was on Regal to show that the goods were delivered back to Legum in accordance with the agreement. He had no reason to dispute or question the testimony of any witness before him on either side of the case. He further said that Brown, an uneducated colored man, made a good appearance and he had implicit confidence in his testimony. He stated: "He was, at least on Light Street, and was told to go to the Jackson Street warehouse of the plaintiff. He goes to the Jackson Street warehouse, where the doors are open, and there

are two men standing on what would be normally a platform but on a level just inside of the warehouse door. He probably did not say anything to them, thinking apparently everything is all right. He shoved the television sets to the rear of the truck, let the two men, who ever they are, take them off, take the two delivery slips, initial one and return the yellow slip to him. He does not know who they were. Now, we have the question." He also found that Brown had every reason to believe that the two white men at the Jackson Street warehouse were the agents of Legum. The trial judge further said: "Now, your man, who is a colored man, a nice appearing man, and a man, as far as I know, perfectly honest and truthfull, but who is not educated, and who would not normally know exactly how to function to protect himself from this kind of a dilemma, and who testified to details of the delivery, but as to other details he cannot remember, and he testifies to the opening of the door and going in and delivering goods which, although I believe and he believes it, I just can not understand. * * * I am trying to balance the evidence. If you had satisfied me, by preponderance of the evidence, that you had delivered these television sets to persons your man had every right to believe, through the conduct of Legum Distributing Company, were their authorized agents to receive them, I would not have any problem at all. I would say you have sustained your burden, but I am not satisfied. * * * If your man had functioned as he should have—hind-sight is better than foresight, of course—but had you had a more responsible, let us say, employee, he would be able to come in here and say 'I delivered these goods to two men, one of whom signed for them, here is his name, this is what he looked like, and I have seen him there before', or something of the kind. How do I know? You are asking me to hold the plaintiff responsible for your employee's act because he says they were standing inside and opened the door for him. Maybe they broke in. I do not know. We just cannot find out who they were. * * * Everyone is perfectly sincere in this case and, yet, it is such a complete mys-

tery. I am not satisfied from a preponderance of the evidence that the television sets were delivered to the Legum Distributing Company. I think Mr. Pairo and his client have done everything within their power to prove the facts, but I am not satisfied upon the preponderance of the testimony and, unfortunate as it is, I find a judgment in favor of the plaintiff, Legum Distributing Company, against the defendant."

From the above statement by the trial judge, who saw and heard the witnesses, he was convinced of the fact that Brown delivered the six television sets to two white men, whom he could not describe and who opened the door for him while inside the Legum warehouse. Part Three, Trials, Rule 9(c) of the *General Rules of Practice and Procedure* provides that in cases tried by the court: " * * * the judgment of the trial court shall not be set aside on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *Maryland Casualty Co. v. Wolff*, 180 Md. 513, 515, 25 A. 2d 665; *Dennis v. Baltimore Transit Co.*, 189 Md. 610, 617, 56 A. 2d 813; *Sherwood Distilling Co. v. Heat & Power Corp.*, 197 Md. 224, 228, 78 A. 2d 759; *Burger v. Burger*, 204 Md. 495, 500, 104 A. 2d 923. We cannot say that the trial judge was clearly wrong in this finding and we will, therefore, base our decision in this case on his finding of fact. However, he further found as a matter of law that Brown had no reason to believe, because he could not describe the two white men whom he had never seen there before and because Legum through its conduct had not held them out to be its authorized agents, that these men were the authorized agents to receive television sets and, therefore, the delivery was not delivery to Legum.

The question, therefore, before us is whether the delivery of these television sets inside the Legum warehouse, to which Brown had been directed by Legum to deliver them, constituted delivery to Legum.

Apparently the leading case on the question here presented is that of *Galbraith & Grant, Ltd. v. Block* (1922),

2 K. B. 155. Action there was brought to recover the price of wine which it was alleged had been sold and delivered to the defendant, who denied the delivery. The wine was delivered by a carrier who was engaged by the plaintiff. The judge below found as a fact that the carrier was the plaintiff's servant and, therefore, that delivery to the carrier was not delivery to the defendant or to anyone authorized by him to receive the wine. The effect of the lower court's finding was that, even though the goods are delivered at the place at which the vendor is directed to deliver them, "* * * yet if an unauthorized person takes them and appropriates them to himself there has been no delivery, however reasonably the vendor's agent may have acted in handing the goods to the actual recipient of them." It was held by the appeal court in that case: "A vendor who is told to deliver goods at the purchaser's premises discharges his obligations if he delivers them there without negligence to a person apparently having authority to receive them. He cannot know what authority the actual recipient has. His duty is to deliver the goods at the proper place, and, of course, to take all proper care to see that no unauthorized person receives them. He is under no obligation to do more. If the purchaser has been unfortunate enough to have had access to his premises obtained by some apparently respectable person who takes his goods and signs for them in his absence, the loss must fall on him, and not on the innocent carrier or vendor." Finding that the judge below seemed not to have considered the question whether the carrier exercised all proper care in handing the goods over to the person who took them and who signed for them, the case was remanded for a new trial on the question "whether the goods were duly delivered having regard to the principle we have stated." *Benjamin on Sales,* (8th Ed.), Book 4, page 690, citing *Galbraith v. Block, supra,* says the following: "When delivery is to be made at the buyer's premises there is a good delivery when the seller delivers them there, without negligence, to a person having apparent authority to receive the

goods. If then an apparently respectable person has obtained access to the buyer's premises receives and signs for the goods in the buyer's name and misappropriates the goods, the loss falls on the buyer." *Williston on Sales,* (Rev. Ed.), Section 450 b, in discussing "Authority of Person Accepting Goods to Receive Delivery," and citing *Galbraith v. Block, supra,* says the following: "Where the seller delivers the goods into the possession or custody of any one other than the buyer, it is evident that such person must have either actual or apparent authority to receive the goods in order to constitute a valid delivery." *Williston* there cites 36 *Harvard Law Review* 1036, in which it was said, among other things: "A seller, however, in making delivery must transfer possession to the buyer in the exact mode assented to by him. *Wheelhouse v. Parr,* 141 Mass. 593, 6 NE 787; *Clauss Shear Co. v. Alabama Barber Supply Co.,* 1 Ala. App. 664, 56 So. 49; *Adams v. Pickrel Walnut Co.* (No. App.) 232 SW 271. It seems reasonable to suppose that the buyer, when he directed that the goods be delivered on the premises, assented only to their being left there under what should appear to be proper circumstances. Consequently the care exercised by the seller was a material matter in determining whether the mode of delivery assented to had been complied with. *Butterwerth & Lowe v. Cathcart,* 168 Ala. 262, 52 So. 896; *Diebold Safe & Lock Co. v. Holt,* 4 Okla. 479, 46 P. 512; *Wilson v. Western Fruit Co.,* 11 Ind. App. 89, 38 NE 827."

The British statute, the Sale of Goods Act, (1893), 56 & 57 Vict. C. 71, S. 29-(1), provides as follows: "Whether it is for the buyer to take possession of the goods or for the seller to send them to the buyer is a question depending in each case on the contract, express or implied, between the parties. Apart from any such contract, express or implied, the place of delievery is the seller's place of business, if he have one, and if not, his residence: provided that, if the contract be for the sale of specific goods [s62 (1)], which to the knowledge of the parties when the contract is made are in some other place, then

that place is the place of delivery." *Benjamin on Sales, supra,* does not deal with this statute other than the above quotation based on the *Galbraith* case, *supra.* This English statute is practically identical to our Uniform Sales Act, Code, (1951), Article 83, Section 61 (1), which provides: "Whether it is for the buyer to take possession of the goods or for the seller to send them to the buyer is a question depending in each case on the contract, express or implied, between the parties. Apart from any such contract, express or implied, or usage of trade to the contrary, the place of delivery is the seller's place of business if he have one, and if not, his residence; but in case of a contract to sell or a sale of specific goods, which to the knowledge of the parties when the contract or the sale was made were in some other place, then that place is the place of delivery."

In *Fox v. Young,* (Texas), (1936), 91 S. W. 2d 857, it was held "delivery" of a 550 pound machine occurred whenever, at the time and place fixed by law or agreed on by the parties, seller does everything necessary to put goods completely and unconditionally at buyer's disposal. In *Reeb v. Bronson,* (1915), 196 Ill. App. 518, the Uniform Sales Act was not involved. There the plaintiff hired a drayman to load and haul goods, defendant paying the charges. It was held that the vendee was placed in actual possession of the goods so as to constitute delivery when such goods were placed in vendee's direct control. Actual delivery consisted in giving to buyer, his servants or accredited agent the real possession of the goods sold. Delivery to a third person, at the direction of the buyer, was delivery to the buyer. In *Edwards v. Willson,* (Wyo.), (1923), 219 P. 233, 234, the sale of sheep was involved. The court there said that what constituted delivery must to a large extent depend on the nature of the property or interest sold, the particular business to which the transaction is incident, and the circumstances attending the transaction. In *Dreyfus v. Raritan Chemical Works,* (1919), 176 N. Y. S. 614, 107 Misc. 369, it was said that if parties by

agreement fixed the place of delivery, delivery of a specified bill, unless waived, was an indispensable requisite to seller's recovery of the purchase price. On the other hand it was held that delivery at that place was a sufficient performance on his part to entitle him to recover, even though the buyer was not there to receive the goods.

Among other cases relied on by the appellee is *Brager v. Levy,* (1914), 122 Md. 554, 90 A. 102. However, it was said in that case, quoting from 31 *Cyc.* 1331: "The apparent authority so far as third persons are concerned is the real authority, and when a third person has ascertained the apparent authority with which the principal has clothed the agent, he is under no further obligation to inquire into the agent's actual authority. The authority must, however, have been actually apparent to the third person who, in order to avail himself of his rights thereunder, must have dealt with the agent in reliance thereon, in good faith, and in the exercise of reasonable prudence, in which case the principal will be bound by the acts of the agent performed in the usual and customary mode of doing such business, although he may have acted in violation of private instructions, for such acts are within the apparent scope of his authority."

Here, it is admitted that Brown was told by Legum to take the television sets "to the Jackson Street warehouse." He was not told at what location there to deliver them or to what person or persons delivery should be made. It would have been a simple matter for Legum to have called the warehouse and to have told the employees there to accept the uncrated television sets. This was not done. Legum did call Lane for Meyers to find out whether the uncrated sets should be accepted. Brown had been accustomed to receiving refrigerators from Legum, loaded by white men, for Regal at the same location he delivered the television sets. We must conclude that these men, who during a business day opened the warehouse door from the inside, took the television sets from the truck, and placed them on the platform, had authority apparent to Brown to receive them. We are

not of opinion that Brown was negligent in not inquiring as to the names of the white men or of looking them over so carefully as to be able to describe them at a trial held over three years after the delivery. The judgment must be reversed.

*Judgment reversed. Judgment entered for the appellant for costs.*